ANDERSON ET AL., APPELLEES, *v.* LOCAL UNION No. 698, RETAIL CLERKS' UNION, A. F. L., ET AL., APPELLANTS.*

(No. 4594—Decided May 23, 1956.)

*Messrs. Davis & Lipps,* for appellees.
*Mr. Robert E. Shuff,* for appellants.

HUNSICKER, J. This is an appeal on questions of law and fact. The case was tried in this court on the transcript of testimony and the exhibit admitted in the Court of Common Pleas.

Harry Anderson, Harold D. Vernon and W. A. Seiler are partners doing business under the trade name of West Point Market, at 1711 West Market Street, Akron, Ohio. This market is a purely intrastate local business, and independent of any chain store or large corporate enterprise.

Twelve persons are employed by the market: three in the meat department and nine in the grocery department. Only

---

*Motion to certify the record overruled, October 17, 1956. Appeal dismissed, 165 Ohio St., 512.

the grocery clerks were members of a union, which held a contract with the market. This contract expired on or about November 1, 1954.

In August, 1954, prior to the expiration of the union contract, one of the partners, Harold Vernon, told the employees of the grocery department that they did not wish to have a union store. At that time, he asked each of such employees individually, if he or she desired to leave the union, to sign a paper writing indicating he or she wished to withdraw from the union. Six members of the grocery department signed this paper, and three refused to sign. The three meat department employees were never members of any union, and they were not asked to sign or take part in these discussions.

On August 27, 1954, the market received a request in writing from the business manager of the Retail Clerks' Council that the local union wished "to enter into negotiations for amendments and changes in the collective bargaining agreement." Thereafter, the lawyers for the respective parties met, but no action toward a new contract was taken, since the market did not wish to continue as a union store.

The three union members continued to work at the market, even though no agreement was reached by the lawyers, and even though they were told that the market would not continue its union affiliation. None of the clerks personally, either the three in the union or those six who had withdrawn, made a demand on the market for any change in the wages paid, hours of work, or other conditions. None of the clerks voted for a strike. None of the clerks knew that a strike was being called until either the day when pickets appeared at the market or the night before the appearance of pickets. None of the clerks engaged in picketing. Each of the clerks who refused to sign the withdrawal paper appeared for work the morning when the pickets were at the market, and, seeing the pickets, each of them refused to cross the picket line.

A picket was placed at the front entrance to the store, and one at an alley through which the supplies were delivered to the rear of the market. These pickets, it is admitted, kept some customers and many deliveries of supplies from coming to the market. These supplies were halted by the picket holding up

his hand to stop a delivery truck, talking with the driver, who then left without delivering his products. There was, however, some delivery of supplies to nearby places, which the market obtained by sending a truck to get such deliveries, and employees or partners of the market also got merchandise from wholesale houses by going direct to the wholesalers.

There is no dispute that the effect of stopping the delivery of supplies caused great loss to the market.

The clerks who desired to remain in the union never personally have made a demand on the market for any change in the contract, and their agent, so far as the record shows, never asked for any specific changes in the contract. There was, of course, the demand for negotiations with the market and for an amendment to a contract which the market no longer desired to keep in force.

We do not have before us the contract between the union and the market, but it must be assumed that upon its expiration there was no longer a requirement that the employees be members of a union, and that the force and effect of the contract was at an end for all purposes. Certainly, at the expiration of the contract there was no requirement that the market be a union shop, and no requirement that the clerks be union clerks.

This action to enjoin the picketing of this place of business was filed, by the partners who owned the market, several weeks after the union placed its pickets near the store. The trial court granted a temporary order of injunction, and, at a later hearing of the case on its merits, the temporary injunction was made permanent.

There are recurring problems before the courts of this country concerning the right to picket. Each case presents a slightly different aspect of this question, which relates to the rights of employees, employers, and the general public. The pendulum which measures these rights has, during the last 20 years, swung in a wide arc. In the last analysis, however, this case must be determined upon the basis of the law of Ohio.

The case before us does not involve a business engaged in interstate commerce. It is a purely local neighborhood enterprise, in which a union, which once had a contract with a majority of the employees, no longer has such a contract. This is

a controversy where the union, without a majority of the employees in its membership, seeks, by means of banners and by requests to suppliers of merchandise, to force the employer to bargain for the employment of union members. Is this unlawful conduct as defined in the case law of Ohio?

We think it is. A late pronouncement by the Supreme Court of Ohio on the subject of picketing or bannering as an unlawful enterprise is found in the case of *W. E. Anderson Sons Co.* v. *Union,* 156 Ohio St., 541, 104 N. E. (2d), 22. In that case, Judge Hart, who wrote the majority opinion, analyzed the important federal cases and demonstrated how the trend of judicial thought changed from (prior to 1937) (1) no picketing, since "economic pressures applied by labor unions had been generally regarded by the state courts as prima facie torts unless a justifiable purpose was shown," (2) to the era of unlimited picketing, because to hinder such acts was an infringement of the right of free speech, (3) to the present period where picketing may be enjoined if it is being conducted for an unlawful purpose.

That decision has just recently been cited with approval by the Supreme Court in *Chucales.* v. *Royalty,* 164 Ohio St., 214, 129 N. E. (2d), 823.

This court, in the case of *Fairlawn Meats, Inc.,* v. *Amalgamated Meat Cutters & Butcher Workmen of North America, Local No. 427, AFL.,* 99 Ohio App., 517, 135 N. E. (2d), 689, said:

"The case which pronounces the policy of the state of Ohio, with respect to organizational picketing, is *Crosby* v. *Rath,* 136 Ohio St., 352, 25 N. E. (2d), 934, and, while it was true that, in that case, there was much evidence of violence which accompanied the picketing, yet the court said, at page 355:

" '* * * The thing upon which the defendants are insisting is that the plaintiff discharge her employees unless they become members of one of the defendant unions. There is no reason or convincing authority sustaining the contention of the defendants that they have the right to engage in picketing or boycotting under such circumstances. That this must be the law is clearly indicated by the intolerable and unexplainable predicament in which an employer might well find himself if picket-

ed by two or more hostile unions with each one insisting that the employer discharge his employees unless they become members of that particular union alone.'

"The latest pronouncement by the Supreme Court of Ohio on the subject of the right to picket for organizational purposes is found in the case of *W. E. Anderson Sons Co.* v. *Union,* 156 Ohio St., 541, 104 N. E. (2d), 22. * * *

"* * *

"This Court of Appeals has had occasion to pass on the right to picket for organizational purposes in the case of *Bean* v. *Local Union No. 698,* 94 Ohio App., 361, 114 N. E. (2d), 445, wherein we said:

" 'In the absence of a dispute between employer and employees, or between the union and the employer or employees, a labor union may not engage in organizational picketing, even though peaceful, for the purpose of bringing pressure to bear upon the employer to require his employees to join the union.'

"In the instant case the principal object and purpose of bannering the places of business of Fairlawn Meats, Inc., was for the purpose of forcing the great majority of employees to join the union. The resultant acts of the union to secure their object, such as coercion of the suppliers of meats, and picketing on property under control of Fairlawn Meats, were the result of the failure of the union to secure the organization of the majority of the employees by peaceful means. This failure to convince the employees and the management was then followed by the picketing lines being established."

A situation, similar to that in the *Fairlawn Meats case, supra,* and in the *Bean case, supra,* exists here. No dispute with the employees existed after the expiration of the contract, for even the three union members continued to work; and they testified they had no dispute with their employer. The market became a nonunion establishment by the statement of the employer, and the majority of the employees desired that no union represent them in their dealings with the employer. The purpose of the picket line was to coerce the employees into rejoining the union and to force the employer, against his will, to accept the union as the bargaining agent of the employees.

In such a situation, the picketing became unlawful under the public policy of this state.

A permanent injunction should be issued as was decreed in the trial court.

The injunction is allowed as prayed for.

*Injunction granted.*

STEVENS, P. J., and DOYLE, J., concur.